**BERLYN, INC., et al., Plaintiffs,**

v.

**THE GAZETTE NEWSPAPERS, INC., et al., Defendants**

**No. CIV. A. S01–606.**

United States District Court,
D. Maryland.

Aug. 9, 2001.

George W. Liebmann, Law Office, Melvin J. Sykes, Law Office of Melvin J. Sykes, Baltimore, MD, for Berlyn, Inc., a Maryland Corporation, Kenneth C. Rossignol, Sherrill Murray, plaintiffs.

Charles O. Monk, II, Daniel R. Chemers, Saul Ewing, LLP, Baltimore, MD, William J. Kolasky, Alice M. Stoeppelwerth, Fiona W. Huang, Wilmer, Cutler and Pickering, Washington, DC, for the Gazette Newspapers, Inc., a Maryland Corporation, the Washington Post Company, a Body Corporate of the State of Delaware, Washington and Baltimore Suburban Press Network, Inc., a Body Corporate of the State of Delaware, defendants.

### *MEMORANDUM OPINION AND ORDER*

SMALKIN, District Judge.

The plaintiffs, Berlyn, Inc., Kenneth Rossignol, and Sherrill Murray filed this nine-count complaint against the defendants, The Gazette Newspapers, Inc. ("Gazette"), The Washington Post Company ("Post"), and the Washington and Baltimore Suburban Press Network, Inc. ("Press Network"), alleging violations of the Sherman Act, the Clayton Act, the Copyright Act, the Maryland Antitrust Act, and state law claims for unfair competition, breach of contract, and tortious interference with contract. Specifically, the plaintiffs allege that the Gazette, the Post, and the Press Network have conspired to restrain trade, attempted to monopolize, discriminated in pricing, participated in acquisitions in violation of federal law, infringed federal copyrights, and committed

various state law torts in connection with the sale of newspapers and newspaper advertising.

The case is before the Court on defendants' motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court has considered the pleadings submitted by the parties, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

## BACKGROUND

The plaintiff Berlyn, Inc. is a Maryland corporation that publishes two weekly community newspapers—*The Prince George's Sentinel* and *The Montgomery County Sentinel.* The plaintiff Kenneth Rossignol is the owner, editor, and publisher of *St. Mary's Today,* a weekly community newspaper in St. Mary's County, Maryland. Plaintiff Sherrill Murray is a resident of Prince George's County and a former member of the College Park City Council. Defendant Gazette has been a wholly owned subsidiary of the Washington Post since 1992. By September 1999, as a result of numerous acquisitions, the Gazette operated 31 papers in the D.C. metropolitan area and its suburbs, including papers in Montgomery and Prince George's counties. According to the complaint, the Gazette's website maintains that it reaches " 'more than 95 percent coverage of single-family homes and 84 percent readership according to Verified Audit Circulation ('VAC').' " Compl. at ¶ 10. Defendant Washington Post is a daily newspaper with wide circulation in Washington D.C. and its surrounding suburbs, including Prince George's and Montgomery counties. Defendant Press Network was formed in 1992 for the purpose of assisting community newspapers with the sale of advertising. The Gazette owns a half-interest in Press Network. According to the complaint, the Press Network's Maryland offices are located at the offices of the Gazette in Gaithersburg, Maryland.

The complaint alleges, among other things, that: the Gazette cut the cost of advertising below the marginal costs of its newspapers, and in some cases provided free advertising, in order to drive existing community newspapers out of business; the Post reduced its rates on legal and auction advertising, charging rates below those charged by the *Montgomery County Sentinel,* and in some cases providing free advertising; Press Network, acting at the behest of Gazette and Post, "revised its rate cards so as to group all the Gazette newspapers together and quote a combined rate for them, thus encouraging advertisers to seek blanket coverage in the entire Gazette network and discouraging advertisers from advertising in the *Sentinel* newspapers, which are listed after the Gazette newspapers and thus appear to duplicate the Gazette newspapers' coverage." Compl. at ¶ 23(d). The complaint alleges that the Gazette employed these practices with respect to other local community papers as well. According to the complaint, advertising allocated to the *Sentinel* papers by the Press Network fell from 65.72% of the *Sentinel*'s advertising in 1997 to 17.66% in 2000. *See* Compl. at ¶ 23(e). The complaint also alleges that the Gazette continued to acquire and expand its ownership of community newspapers in the D.C. metropolitan area, that it hired *Sentinel* employee Bruce Branch, and in late 1999, hired the whole *Sentinel* newsroom, and that it infringed Berlyn's copyright by republishing stories that were originally written by Bruce Branch for the *Prince George's Sentinel.* Finally, the plaintiffs challenge the Gazette's acquisition of its half-interest in Press Network, as well as its acquisition of the assets of Chesapeake Publishing Company, which includes papers in Southern Maryland and Prince George's County, the effect of

which will be the Gazette's capturing of "some 95% of the newspaper advertising market." Compl. at ¶ 25.

## STANDARD FOR MOTION TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss under Rule 12(b)(6), a court must accept the allegations contained in the complaint as true. *See DeBauche v. Trani,* 191 F.3d 499, 505 (4th Cir.1999). The court is not, however, "bound by the plaintiff's legal conclusions, since the purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint." *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994). The motion to dismiss standard has been applied "rigorously in anti-trust cases," and " 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.' " *Sun Dun, Inc. of Washington v. Coca-Cola Co.,* 740 F.Supp. 381, 385 (D.Md.1990) (quoting *Hospital Building Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)); *see also Virginia Vermiculite, Ltd. v. W.R. Grace & Co.,* 156 F.3d 535, 539 (4th Cir. 1998).

### Statute of Limitations

As an initial matter, the motion for dismissal of all claims relating to the 1992 acquisition of the Gazette by the Washington Post is rendered moot, as the plaintiffs have stated that they do not seek to recover for the 1992 acquisition. *See* Pl's Opp'n to Post and Gazette's Mot. to Dismiss at 7. Because a four-year statute of limitations applies to private civil antitrust actions,

pursuant to the Clayton Act, 15 U.S.C. § 15b, plaintiffs claims remain viable only to the extent that they allege causes of action that have accrued within the limitations period.

### Count I—Section 1 of the Sherman Act

■ In Count I, the plaintiffs allege that the defendants, along with other co-conspirators, including advertisers and officers/employees of Gazette and Press Network, engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in newspapers, newspaper editorial content, and newspaper advertising in violation of the Sherman Act, 15 U.S.C. § 1. Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. To state a claim under Section 1, the plaintiffs must establish that "at least two persons [are] acting in concert, and ... the restraint complained of must constitute an unreasonable restraint on interstate trade or commerce." *Estate Constr. Co. v. Miller & Smith Holding Co., Inc.,* 14 F.3d 213, 220 (4th Cir.1994).

### Conspiracy

■ As stated above, to state a claim under Section 1, plaintiffs must establish the existence of "a relationship between at least two legally distinct persons or entities." *Oksanen v. Page Mem'l Hosp.,* 945 F.2d 696, 702 (4th Cir.1991). This requirement is grounded in the intracorporate immunity doctrine set forth in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In *Copperweld,* the United States Supreme Court concluded that a parent corporation and its wholly owned subsidiary were not legally capable of conspiring

in restraint of trade in violation of Section 1 of the Sherman Act. *See id.* at 777, 104 S.Ct. 2731. The Court specifically declined to consider the related issue of whether "a parent may be liable for conspiring with an affiliated corporation it does not completely own." *Id.* at 767, 104 S.Ct. 2731. In this case, defendants Post and Gazette (Gazette is wholly-owned by the Post) are alleged to have conspired with the Press Network (which is half-owned by the Gazette), as well as employees of these corporations, and unnamed advertisers. T *Copperweld* doctrine makes clear that Post and Gazette are incapable of conspiring under this statute. While the Supreme Court declined to consider the applicati · ˆ intracorporate immunity to situations in which one of the parties, like Press Network, was not wholly-owned, the Fourth Cᵤᵣcuit has applied the principles set forth in *Copperweld* in holding that related entities with a "similar unity of interest" may be found incapable of conspiring in restraint of trade. *Oksanen,* 945 F.2d at 703. In *Oksanen,* the Fourth Circuit held that a hospital and employees on its medical staff "lacked the capacity" to conspire in restraint of trade. *Id.* at 706. The court noted that "[c]onsistent with *Copperweld,* we must examine the substance, rather than the form, of the relationship" between the related entities. *Id.* at 703. In *Zachair, Ltd. v. Driggs,* 141 F.3d 1162, 1998 WL 211943 (4th Cir.1998) (unpublished opinion), the Fourth Circuit utilized the reasoning of *Copperweld* and *Oksanen* to conclude that a conspiracy consisting of a defendant and other defendants controlled by him "constituted one

entity incapable of conspiring under § 1 of the Sherman Act." *Id.* at * 3. The court noted that its decision would have been the same even if the plaintiff had alleged that the individual defendant did not own all of the corporate defendants that he controlled. *See id.* Therefore, the court based its decision that the defendants were incapable of conspiring on control, rather than ownership. While this line of Fourth Circuit cases presents a legitimate question as to whether the defendants in this case are capable of conspiring under Section 1, the Court must, under the strictures inherent in the Rule 12(b)(6) setting, let the issue of the Gazette's control over Press Network and its employee coconspirators, and the potential unity of interest between them, be more fully developed during discovery.[1]

### *Unreasonable Restraint*

■ Courts considering whether a restraint is unreasonable must determine whether the restraint is deemed to be a *per se* unreasonable restraint, or whether a "rule of reason" approach should be followed. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Oksanen,* 945 F.2d at 708–709. Agreements that are *per se* unreasonable are those that have such a "pernicious effect on competition and lack of any redeeming virtue" that they "are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct.

---

1. The plaintiffs may find themselves in a difficult position upon completion of discovery. If they provide sufficient evidence that Press Network was not controlled by Gazette but was functioning independently (in order to avoid application of the intracorporate conspiracy doctrine), they may weaken their ability to provide evidence, as required by *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), that eliminates the possibility that Press Network was acting independently from Gazette and Post.

514, 2 L.Ed.2d 545 (1958). Restraints that have been held to be *per se* illegal include price-fixing, group boycotts, and market-allocation agreements among competitors. If the restraint is not *per se* illegal, then the "rule of reason" approach requires the court to consider the impact of the restraint on competition in a relevant market. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The defendants suggest that the conduct at issue in this case should be analyzed under the rule of reason approach. Whether this case should be analyzed under a *per se* or rule of reason approach, however, is a fact-based question that should await the completion of discovery. *See, e.g., Continental Airlines, Inc. v. United Air Lines, Inc.*, 120 F.Supp.2d 556, 565 (E.D.Va.2000). Moreover, the reasonableness of the restraints alleged by the plaintiffs cannot be assessed until the record in this case has been more fully developed. *Advanced Health–Care Servs., Inc. v. Radford Community Hosp.*, 910 F.2d 139, 145 (4th Cir. 1990).

■ Even if, as defendants suggest, the rule of reason analysis were the appropriate approach to follow in this case, the plaintiff's allegations are sufficient to withstand a motion to dismiss. Under this analysis, the plaintiffs must demonstrate "(1) that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market; (2) that the objects and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy." *Advanced Health–Care*, 910 F.2d at 144. The specific elements challenged by the defendants will be addressed in turn.

### Relevant Market

The defendants claim that the plaintiffs have failed properly to allege a relevant market, as required under the rule of reason approach for a Section 1 violation, as well as for pleading a Sherman Act, Section 2 claim. The plaintiffs, while defining the market in various forms throughout the complaint, confirm in their memoranda that the relevant market should be defined as "weekly community newspapers in the Maryland suburbs of Washington." *See* Pl.'s Opp'n to Post & Gazette's Mot. to Dismiss at 5. The complaint further states that weekly newspapers make up a market separate and apart from broadcasting and other media, because newspapers provide more in-depth political coverage than broadcast media, and weekly newspapers in particular provide more detailed print advertisements and coverage of auctions and legal notices than other media.

■ A relevant market has two parts—the product market and the geographic market. *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The product market identifies the products that compete with each other, as defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 325, 82 S.Ct. 1502. The relevant geographic market is defined as the area where suppliers "effectively compete and to which their customers could practicably turn for alternative sources of such products." *M & M Medical Supplies & Service v. Pleasant Valley Hosp.,* 981 F.2d 160, 170 (4th Cir.1993).

■ In *Community Publishers, Inc. v. DR Partners,* 139 F.3d 1180 (8th Cir.1998), the appellate court affirmed the district court's opinion (reached after hearing expert testimony) that the relevant product market was limited to the local daily newspaper market, and did not include national or state newspapers, radio, TV, circulars, or junk mail. *See id.* at 1184. The court

also affirmed the district court's finding that the relevant product market actually consisted of "two markets: one for readers and one for advertisers." *Id.* In making this finding, the district court relied on the U.S. Supreme Court's opinion in *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). *See Community Publishers, Inc. v. Donrey Corp.*, 892 F.Supp. 1146, 1155 (W.D.Ark.1995). In *Times–Picayune*, the Court explained that "every newspaper is a dual trader in separate though interdependent markets; it sells the paper's news and advertising content to its readers; in effect that readership is in turn sold to the buyers of advertising space." *Times–Picayune*, 345 U.S. at 610, 73 S.Ct. 872. The Court stated that the industry's "own characterization of the products involved" is useful in determining the scope of the relevant market, and, in applying this concept to the case before it, the Court noted that "[t]he advertising industry and its customers, for example, markedly differentiate between advertising in newspapers and in other mass media." *Id.* at 612 n. 31, 73 S.Ct. 872. Based on this, the Court excluded advertising placed through other communication media from the relevant market. *See id.* at 612, 73 S.Ct. 872. This analysis, as adopted by the court in *Community Publishers*, supports a finding that the weekly newspaper market is a sufficient relevant product market for purposes of withstanding the motion to dismiss in this case.

■ The plaintiffs defined the relevant geographic market in this case as the "Maryland Suburbs of Washington." Discovery is necessary before a determination can be made regarding the boundaries of the "Maryland Suburbs of Washington," and whether newspapers in St. Mary's County (historically bucolic, but rapidly suburbanizing), compete in the same market as those in suburbs closer to Washington, D.C., such as Montgomery (historically suburban) and Prince George's (historically agricultural, but rapidly urbanizing) counties, or whether these areas would constitute two distinct geographic markets. If the markets are distinct, plaintiffs' antitrust claims may not remain viable.

While the relevant market defined by the plaintiffs in the complaint is sufficient to withstand the defendants' motions to dismiss, a final determination of the definition of both the product and geographic components of the relevant market must await the completion of discovery. Courts have noted that defining the relevant market is a fact-intensive inquiry, and therefore, courts hesitate to dismiss a complaint for failure adequately to plead a relevant market. *See Continental Airlines, Inc. v. United Air Lines, Inc.*, 120 F.Supp.2d 556, 568 (E.D.Va.2000); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."). The district court in the *Community Publishers* case, discussed *supra*, did not make its decision on the definition of the relevant market until after a non-jury trial was held and expert witness testimony was reviewed. The defendants cite *America Online, Inc. v. GreatDeals.Net*, 49 F.Supp.2d 851 (E.D.Va. 1999) in support of their argument that a motion to dismiss may be granted in cases where the plaintiffs have failed to allege a legally sufficient relevant market. In *America Online*, the court, relying on *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir.1997), dismissed the complaint because the proposed product market did not include interchangeable substitutes. *See America*

*Online,* 49 F.Supp.2d at 859. In this case, the complaint sufficiently sets forth its rationale for not including broadcasting and other media in the relevant market, and the case law cited *supra,* particularly the U.S. Supreme Court's decision in *Times–Picayune,* support the plaintiff's position that other media are not necessarily interchangeable with newspaper advertising or readership. At this point in the litigation, prior to any discovery, the plaintiff's pleading of a relevant market is legally sufficient.

### Antitrust Injury

■ Defendants next claim that the plaintiffs have failed sufficiently to allege an antitrust injury. *See* Compl. at ¶ 30. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ...." 15 U.S.C. § 15(a); *see also Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Courts have made clear that "[b]ecause the antitrust laws are intended to protect competition, and not simply competitors, only injury caused by damage to the competitive process may form the basis of an antitrust claim." *Thompson Everett, Inc. v. National Cable Adver.,* 57 F.3d 1317, 1325 (4th Cir.1995) (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Plaintiffs allege that Gazette's numerous acquisitions, and the Gazette and Post's improper undercutting of advertising rates, have damaged competition for advertisers among community newspapers, resulting in a loss of business and advertising revenue for Berlyn and Rossignol.

■ Plaintiffs Berlyn and Rossignol have sufficiently plead that they have been injured in their business and property,

through loss of income and advertising, as a direct result of Gazette and Post's allegedly anti-competitive behavior. This allegation is sufficient for purposes of surviving the motion to dismiss the antitrust counts contained in this complaint. *See Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.,* 910 F.2d 139, 149 (4th Cir.1990); *see also Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 876 (3rd Cir.1995) (finding that most cases resolve the issue of antitrust injury at summary judgment or directed verdict stage,·and not on motion to dismiss). In fact, on facts similar to those presented in this case, the court in *Community Publishers,* discussed *supra,* affirmed the district court's finding that a competing newspaper publisher had suffered a sufficient antitrust injury such that it had standing to challenge a newspaper acquisition under the antitrust laws. *See Community Publishers,* 139 F.3d at 1183.

Press Network also alleges that the plaintiffs have failed adequately to allege antitrust injury. Berlyn has sufficiently alleged, for purposes of surviving this motion to dismiss, that the alleged conspiracy between Gazette and Press Network to allocate advertising to Gazette and away from the *Sentinel* papers has caused damage to the competitive process for obtaining newspaper advertising, resulting in Berlyn's loss of advertising revenue. Rossignol, on the other hand, has not sufficiently alleged how his St. Mary's newspaper has been injured by the conduct of Press Network. The allegations in the complaint relating to Press Network's revision of rate cards specifically involved Berlyn's *Sentinel* newspapers, and not *St. Mary's Today.* Therefore, there being no other injury to Rossignol resulting from the conduct of Press Network alleged in the complaint, his antitrust claims against Press Network will be dismissed.[2]

---

**2.** For the same reasons, Rossignol's claim for

unfair competition will also be dismissed

The Court expects that discovery will clarify the particular injuries suffered by Berlyn and Rossignol with respect to each antitrust count, as it appears that Rossignol, while sufficiently alleging injury as a result of the Gazette's recent acquisition of Chesapeake Publishing, has not, for example, been affected by the alleged rate cutting that is a major part of this complaint.

 As to plaintiff Sherrill Murray, however, she lacks standing to bring any antitrust action against the defendants, because she cannot allege the requisite antitrust injury. The complaint alleges that Murray has been "injured by Defendants' conduct in her capacity as a citizen interested in the political and civic life of her community. The violations charged herein have stilled independent editorial voices and reduced the presentation and discussion of diverse viewpoints." Compl. at ¶ 54. While this claim could be true, it does not present a cognizable injury to business or property, as required by Section 4 of the Clayton Act. In support of their argument that plaintiff Murray has standing, the plaintiffs cite to *Reilly v. Hearst Corp.*, 107 F.Supp.2d 1192 (N.D.Cal.2000), a case in which the court held that a newspaper *subscriber* had standing to challenge "transactions caus[ing] injury to competition for readers among economically viable newspapers." *Id.* at 1195. Even were this Court to adopt the court's analysis in *Reilly*, it does not apply here, because the plaintiffs have not alleged that Murray subscribes to any of the newspapers that are the subject of this complaint. Therefore, because plaintiff Murray cannot allege that she is a "consumer in the market in which trade is

illegally restrained," she lacks standing to bring any of the antitrust claims alleged in the complaint. *See Barber & Ross Co., v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1279 n. 1 (4th Cir.1987) (citing *Associated General Contractors of California, Inc. v. California Council of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).[3]

*Count II—Section 2 of the Sherman Act*

 In Count II of the complaint, the plaintiffs allege that the defendants have been engaged in an attempt to monopolize and a conspiracy to monopolize the community newspaper business in Montgomery County, Prince George's County, and Southern Maryland, in violation of the Sherman Act, 15 U.S.C. § 2. To state a claim for attempted monopolization, the plaintiffs must demonstrate: "(1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success." *M & M Medical Supplies and Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir.1993); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

 Defendants challenge this count on the ground that the plaintiffs have failed sufficiently to plead the relevant market. As discussed above, the plaintiffs' allegations of the relevant market are adequate to withstand this motion to dismiss. Likewise, plaintiffs' allegations regarding Gazette's rate cutting practices and its acquisition of numerous community newspapers throughout the D.C. suburbs are sufficient, at the motion to dismiss stage, for

against Press Network.

**3.** Murray also lacks standing to bring the other claims alleged in the Complaint, as she is not a copyright holder under Count V, she has not suffered any injury such that she would

have standing to assert a claim for unfair competition under Count VI, and she is not a party to the contract that is the subject of Counts VII or VIII. Therefore, she will be dismissed from the case completely.

purposes of pleading a specific intent to monopolize the weekly community newspaper market and a dangerous probability of monopolization. In addition, plaintiffs have alleged that Gazette has become the dominant community newspaper in the Washington suburbs of Maryland (with its website claiming "95 percent coverage of single-family homes and 84 percent readership"), as a result of these acquisitions. Similar allegations have provided sufficient evidence of an attempt to monopolize. *See Advanced Health–Care,* 910 F.2d at 147; *see also M & M Medical,* 981 F.2d at 168 (citing 3 Areeda & Turner ¶ 835c, at 350) (noting that claims involving greater than 50% market share should be treated as attempts to monopolize if other elements are met). The Fourth Circuit has held that such allegations set forth a violation of Section 2. In *Greenville Publ'g Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391 (4th Cir.1974), the Fourth Circuit held that a plaintiff's allegation that a competing advertising tabloid publisher sold ads below cost to drive the plaintiff's tabloid out of business "adequately describes a violation of section 2 of the Sherman Act. Deliberate below-cost pricing is generally considered a severely anticompetitive practice." *Id.* at 396. The court stated that, while this type of conduct may not be illegal in itself, it can serve as evidence of the specific intent necessary to prove an attempted monopolization claim. *See id.* Each of these elements should be the subject of discovery such that the scope of the relevant market, the defendants' intent, and the extent of the defendants' market power can be ascertained.

■ Plaintiffs also allege a conspiracy to monopolize claim under Section 2. To state a claim for conspiracy to monopolize, the plaintiffs "must show concerted action, a specific intent to achieve an unlawful monopoly, and commission of an overt act in furtherance of the conspiracy." *Advanced Health–Care Servs.,* 910 F.2d at 150. While the plaintiffs have made allegations sufficient to survive the motion to dismiss, as they did with respect to the attempted monopolization claim, the intracorporate conspiracy doctrine, as discussed above in connection with the Section 1 claim, could, depending on the outcome of discovery, apply to bar this claim for conspiracy as well. *See, e.g., Advanced Health–Care,* 910 F.2d at 150; *Oksanen,* 945 F.2d at 710.

■ As to Press Network, the part of this count of the complaint alleging attempted monopolization will be dismissed, because Press Network does not compete in the relevant market alleged by the plaintiffs in their complaint. The Fourth Circuit has made clear that "[o]ne who does not compete in a product market or conspire with a competitor cannot be held liable as a monopolist in that market." *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 104 (4th Cir.1987). Press Network "facilitates the sale of newspaper advertising for community newspapers in exchange for a commission," but it does not compete with weekly community newspapers in the Maryland suburbs of Washington. *See* Press Network's Mot. to Dismiss at 10–11. Therefore, this count is only viable against Press Network to the extent it alleges a conspiracy to monopolize.

*Count III—Price Discrimination under the Robinson–Patman Act*

In this count of the complaint, the plaintiffs allege that the defendants have engaged in unjustified price discrimination in violation of Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act,

15 U.S.C. § 13(a).[4] The complaint alleges that this violation resulted in a lessening of competition in the sale of newspapers and newspaper advertising, a reduction in the choice of advertising media, and a raising of advertising rates. According to the complaint, Gazette cut the cost of advertising below the marginal costs of its newspapers and provided free advertising in some instances, thus suggesting that it charged some advertisers less than other advertisers. The Post allegedly reduced its rates on advertising, and the Press Network revised its rate cards to quote a combined rate for all Gazette newspapers, thus discouraging advertisers from advertising in the *Sentinel* newspapers.

■ Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a) states that:

> "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition ...." 15 U.S.C. § 13(a).

To establish a violation of § 13(a), a plaintiff must prove: (1) that the sales were made in interstate commerce; (2) that the commodity sold to them was of the same grade and quality as that sold to other purchasers; (3) that the defendants discriminated in price as between the plaintiffs and other purchasers; and (4) that

the discrimination had a prohibited effect on competition. *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); *see also Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 163 (4th Cir.1999).

■ By its terms, the statute is limited to price discrimination in the sale of commodities. The majority of courts to consider the issue have concluded that newspaper advertising is not a commodity under the statute. *See Ambook Enters. v. Time, Inc.*, 612 F.2d 604, 609–610 (2nd Cir.1979); *Advo Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1195 n. 3 (3rd Cir.1995); *National Tire Wholesale, Inc. v. Washington Post Co.*, 441 F.Supp. 81, 85–86 (D.D.C.1977); Oppenheim & Shields, Newspapers and the Antitrust Laws, § 75, at 285. Therefore, plaintiffs may not pursue their Robinson–Patman claim with respect to newspaper advertising, and may only pursue it to the extent that they allege price discrimination in the sale of newspapers themselves, as courts have held that newspapers *are* considered a commodity under the Act. *See Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383, 389 n. 11 (8th Cir.1974); *see also First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1038 (7th Cir.1989). While defendants correctly note the lack of detail contained in plaintiffs' allegations of discrimination in pricing in the sale of newspapers, the plaintiffs will nonetheless be permitted to maintain this claim, subject, of course, to any argument the defendants may choose to make at summary

---

**4.** The complaint alleges that the claim is being brought under Section 3 of the Clayton Act, 15 U.S.C. § 14, but it appears to be a claim for price discrimination under Section 2(a), as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a). The parties' memoranda have analyzed the claim as being the latter, and therefore the Court will analyze the claim as being one for price discrimination under 15 U.S.C. § 13(a). In any event, the majority of courts that have considered the issue have found that advertising is not a commodity under Section 2 or Section 3 of the Clayton Act, as will be discussed *infra*. *See* Oppenheim & Shields, Newspapers and the Antitrust Laws, § 75, at 285.

judgment once discovery has been completed.

As to Press Network, however, this count of the complaint will be dismissed because Press Network only places advertising and does not sell newspapers. There has been no allegation in the complaint that Press Network charged different prices for newspapers—the only "commodity" at issue in this case. Therefore, this count of the complaint is dismissed against Press Network.

*Count IV—Section 7 of the Clayton Act*

Count IV alleges that the defendants violated Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits acquisitions that may have the effect of substantially lessening competition or tending to create a monopoly. Specifically, the plaintiffs challenge the Gazette's acquisition of other Montgomery and Prince George's County publications, its recent acquisition of Chesapeake Publishing's papers in Prince George's County and Southern Maryland, and its acquisition of a half-interest in Press Network. The plaintiffs claim that these violations have had the effect of substantially lessening competition and creating an effective monopoly in the sale of newspapers and newspaper advertising. As discussed above, only those acquisitions which occurred since February 28, 1997 may be challenged in this action. *See* 15 U.S.C. § 15b.

According to the U.S. Supreme Court, "Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect *'may* be substantially to lessen competition.'" *California v. American Stores Co.,* 495 U.S. 271, 284, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990) (quoting Clayton Act § 7, 15 U.S.C. § 18) (emphasis supplied). Furthermore, the Court has ruled:

"that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *United States v. Philadelphia National Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

A plaintiff may establish a violation of this statute if there is a reasonable probability that competition would be adversely affected. *F.T.C. v. Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). The complaint alleges that the Gazette has become the dominant community newspaper as a result of these acquisitions, with at least 80% market share. A combined market share for a newspaper that reaches this level after a merger "raise[s] a presumption that the acquisition violate[s] Section 7." *Community Publishers,* 139 F.3d at 1184.

In order for liability to arise under Section 7 of the Clayton Act, the relevant market must be defined. For reasons already stated, any challenge to the relevant market should await the completion of discovery. *See United States v. Grinnell Corp.,* 384 U.S. 563, 573, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (analysis of relevant market is the same under Section 7 and Sherman Act). In addition, Section 7 requires that the plaintiff suffer an antitrust injury. Berlyn and Rossignol have alleged antitrust injuries sufficient for purposes of stating a claim under this section, as discussed *supra. See also Community Publishers,* 139 F.3d at 1183 (finding that competing newspaper had shown antitrust injury sufficient for violation of Section 7).

While the plaintiffs have adequately alleged a Section 7 claim against Gazette and Post, they have not sufficiently stated such a claim against Press Network. Even assuming that the Gazette's acquisition of a one-half interest in Press Network is within the four-year statute of limitations and is thus actionable (no date is provided in the complaint), the Press Network is the acquired company in that acquisition and, therefore, cannot be the subject of an action brought under Section 7. See, e.g., Dailey v. Quality School Plan, Inc., 380 F.2d 484, 488 (5th Cir.1967). As to the Gazette's other acquisitions, the complaint does not allege that the Press Network was a party to any of these acquisitions, and therefore, this count of the complaint must be dismissed as against Press Network. The mere fact that Press Network is partially owned by Gazette does not make Press Network liable for the effects that Gazette's acquisitions may have on other newspapers.

*Count V—Copyright Act*

In this count, plaintiff Berlyn alleges that the Gazette appropriated and impaired Berlyn's copyright on stories written by reporter Bruce Branch for the *Prince George's Sentinel* in violation of the Copyright Act, 17 U.S.C. § 504. Specifically, Berlyn alleges that Gazette republished those stories using Branch's byline when Branch was later working for the Gazette.

This claim will be dismissed, because this Court lacks subject matter jur-

isdiction over it. Section 411(a) of Title 17 of the United States Code states that "no action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title." [5] Courts have construed this statutory language to require copyright registration as a jurisdictional prerequisite to bringing an action under the Copyright Act. See CACI International, Inc. v. Pentagen Technologies Int'l, Ltd., 70 F.3d 111, 1995 WL 679952, at \*3 (4th Cir.1995) (unpublished opinion); *Araya v. Latino Publ'g, Inc.*, 2001 WL 436155, at \*2 (D.Md. 2001); see also Brewer–Giorgio v. Producers Video, Inc., 216 F.3d 1281, 1285 (11th Cir.2000); Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 658 (4th Cir.1993) (noting that " § 411(a) merely requires a copyright owner to register its copyright before filing an action for copyright infringement"). There are no allegations in the complaint that Berlyn or *The Prince George's County Sentinel* holds a statutory copyright, or ever applied for a copyright, on the stories written by its former employee, Bruce Branch. Therefore, because Berlyn has not alleged that an application for copyright registration has been filed, this Court lacks subject matter jurisdiction over this count of the complaint and it will be dismissed.

Berlyn argues that under Section 412 of Title 17, non-registration only denies it the right to seek statutory damages, and does not deny it the common law right to sue for damages and profits.[6] Section 412 pro-

---

5. There are statutory exceptions to this requirement but none applies here. *See* 17 U.S.C. § 411(a).

6. Common law copyright has largely been preempted by the Copyright Act. *See Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (citing 17 U.S.C. § 301(a)). Sec-

tion 301(a) states that any rights "equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State."

vides that a work must be registered prior to the commencement of the infringement in order for a copyright owner to be able to recover statutory damages and attorney's fees.[7] *See* Nimmer on Copyright § 7.16[C][1] at 7–169. Thus, plaintiffs argue that this statute does not deny them the right to sue for actual damages and profits under Section 504(b). This is, however, an improper reading of Section 412. It is true that a copyright owner may, under Section 412, recover actual damages and obtain other relief even if the owner did not register the copyright until after the alleged infringement. While the statute allows parties to recover some damages even if the infringement preceded registration, the court does not have jurisdiction over the claim if the copyright has *never been registered*. *See Brewer–Giorgio*, 216 F.3d at 1285 ("Although a copyright need not have been registered in all cases before it may be infringed, the owner of that copyright must register the copyright before a federal court can entertain an infringement suit."); *see also* Nimmer on Copyright § 7.16[C][3] at 7–177 & n. 145.2. The case cited by Berlyn in support of its copyright claim, *Fitzgerald Publ'g Co. v. Baylor Publ'g Co., Inc.*, 670 F.Supp. 1133 (E.D.N.Y.1987), involved a copyright that was eventually registered, and did not present a situation, like this one, where registration never occurred. Therefore, because the plaintiffs have failed to allege that they ever applied for a copyright in connection with the newspaper stories, Count V of the Complaint will

be dismissed for lack of subject matter jurisdiction.

*Count VI—Unfair Competition*

■ In this count of the complaint, the plaintiffs seek damages for unfair competition under Maryland state law based on the alleged violations of antitrust law outlined above. The Maryland courts have defined unfair competition as "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods .... What constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 237, 34 A.2d 338 (1943); *see also Trimed, Inc. v. Sherwood Medical Co.*, 977 F.2d 885, 891 (4th Cir.1992).[8] This claim survives the defendants' motions to dismiss, and must await discovery and the creation of a factual record. Indeed, this Court has noted that "a violation of antitrust laws could itself constitute unfair competition," and therefore, this count will not be dismissed so long as plaintiffs' antitrust claims remain viable. *Sun Dun, Inc. of Washington v. Coca–Cola Co.*, 740 F.Supp. 381, 397 (D.Md.1990).

Defendant Press Network argues that this claim must be dismissed as against it, because it does not compete with the plaintiffs. While Press Network may not be a direct competitor of the plaintiff newspapers, it is certainly conceivable that the alleged conspiracy alleged in the antitrust counts between Press Network and the

---

7. There is a limited exception to this in the case of a published work if registration is made within three months after the first publication of the work. *See* 17 U.S.C. § 412(2). This exception does not apply here.

8. Plaintiff Murray lacks standing to bring this claim, as she has not alleged an injury sufficient for standing. Even assuming that she has standing as a consumer to assert a claim for unfair competition, she has failed to allege that she subscribes to any of the papers that are the subject of this complaint, and therefore, cannot show how she has been injured. In addition, because the complaint lacks any mention of any conduct by Press Network which could have affected plaintiff Rossignol, Plaintiff Rossignol has failed to adequately plead an unfair competition claim against Press Network.

Gazette (who is a competitor) could provide evidence sufficient to support a claim for unfair competition. *See Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.,* 53 Md.App. 379, 389, 454 A.2d 367 (1983). Unfair competition claims have survived motions to dismiss in situations where the plaintiff and defendant were not direct competitors. *See, e.g., Sun Dun,* 740 F.Supp. at 397 (plaintiff was servicer of vending machines and defendants were manufacturers and distributors of soft drinks); *Trimed,* 977 F.2d at 891 (plaintiff was a supplier and defendant was a manufacturer of medical products). Therefore, because the antitrust claims in this case remain viable and could provide evidence of unfair competition, this count will not be dismissed at this stage of the litigation.

*Count VII—Breach of Contract*

This count of the complaint alleges that the defendant Press Network breached its contract with plaintiff Berlyn, a member of the Press Network, by allocating advertising placed by national, regional, and local advertisers so as to favor Gazette newspapers. While it is possible that Berlyn may have a viable breach of contract claim against Press Network, this allegation is insufficient to meet even the minimal pleading requirements of Federal Rule of Civil Procedure 8(a)(2), as it fails to adequately articulate the existence of a contract or the nature of Press Network's contractual obligations. *See Pritchett v. General Motors Corp.,* 650 F.Supp. 758, 763 (D.Md.1986). Therefore, this claim will be dismissed, without prejudice to the plaintiff's filing of an amended complaint within 15 days hereof that adequately alleges the existence and nature of Press Network's contractual obligations to Berlyn. *See id.; see also United States v. EER Systems Corp.,* 950 F.Supp. 130, 134 (D.Md.1996) (allowing plaintiff leave to amend complaint to better detail the contracts that were breached).

*Count VIII—Intentional Interference with Contract*

In this count of the complaint, the plaintiff Berlyn alleges that defendants Gazette and Post intentionally interfered with Berlyn's contract with Press Network. Specifically, the complaint alleges that the defendants Post and Gazette used their ownership and influence of Press Network (by way of the Gazette's ownership of a half-interest in Press Network) to induce Press Network to violate its obligations to Berlyn, one of its members, and to disfavor Berlyn's *Sentinel* newspapers in the allocation of advertising.

The tort of intentional interference with contract "is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." *Macklin v. Robert Logan Assocs.,* 334 Md. 287, 297, 639 A.2d 112 (1994). The latter type is known as "tortious interference with prospective contractual relations." *Id.* at 301, 639 A.2d 112. The complaint in this case fails to allege which branch of the tort was committed. Furthermore, if the claim is for interference with an existing contract, which is the most likely claim asserted, as evidenced by the bringing of a breach of contract claim against Press Network, then the plaintiff has not sufficiently alleged the existence of a contract. Therefore, this claim will also be dismissed, without prejudice to the timely filing of an amended complaint which adequately sets forth the branch of the tort that has allegedly been committed, and the existence of a contract, if necessary.

*Count IX—Maryland Antitrust Act*

Finally, the plaintiffs bring an action for violation of the Maryland Antitrust Act, Md.Code Ann., Com. Law, § 11–204(a)(1), (2), and (3), in connection with the alleged antitrust violations outlined above. Subsection (a)(1) is analogous to Section 1 of the Sherman Act and Subsection (a)(2) is analogous to Section 2 of the Sherman Act. *See Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 53 & 66, 485 A.2d 663 (1984). Subsection (a)(3) is similar to Section 2(a) of the Clayton Act involving price discrimination. *See Hinkleman v. Shell Oil Co.,* 962 F.2d 372, 381 n. 12 (4th Cir.1992). Subsection (a)(3) of the Maryland Antitrust Act is, however, different in scope from the Robinson–Patman Act. While Robinson–Patman applies by its terms only to commodities, Section(a)(3) of the Maryland Antitrust Act applies by its terms to commodities and services. *See* § 11–204(a)(3). Therefore, while Count III of the complaint under the Robinson–Patman Act will be dismissed to the extent it involves allegations of price discrimination in the allocation of newspaper advertising, a service, the plaintiffs' similar claim under Subsection (a)(3) of the Maryland Antitrust Act will remain viable. To the extent that the federal antitrust claims alleged in Counts I and II remain viable, these claims under Maryland antitrust law will also remain in this case, and will not dismissed at this stage of the litigation.

## CONCLUSION

To summarize the Court's rulings, plaintiff Sherrill Murray lacks standing to bring any of the claims asserted in this case, and therefore, she will be dismissed as a plaintiff. All of plaintiff Rossignol's claims against Press Network will be dismissed. All defendants' motions to dismiss claims asserted in Count I under Section 1 of the Sherman Act will be denied. Defendants' motions to dismiss claims asserted in Count II under Section 2 of the Sherman Act will be denied, except that plaintiffs may not bring an attempted monopolization claim against Press Network, and may only proceed on a conspiracy to monopolize theory. With respect to Count III, Post and Gazette's motion to dismiss claims asserted under the Robinson–Patman Act will be granted to the extent the plaintiffs allege price discrimination in the sale of newspaper advertising, but it will be denied to the extent plaintiffs allege price discrimination in the sale of newspapers. Press Network's motion to dismiss Count III will be granted, because Press Network is not in the business of selling newspapers. With respect to Count IV under Section 7 of the Clayton Act, Post and Gazette's motion to dismiss will be denied, but Press Network's motion to dismiss will be granted, because Press Network is the acquired company and cannot be held liable under this statute. Gazette and Post's motion to dismiss claims asserted in Count V under the Copyright Act will be granted. All defendants' motions to dismiss Count VI for unfair competition will be denied. Press Network's motion to dismiss Count VII for breach of contract will be granted, without prejudice to the plaintiffs' filing of a timely amended complaint outlining the existence of a contract and the nature of Press Network's contractual obligations. Gazette and Post's motion to dismiss Count VIII for intentional interference with contract will be granted, without prejudice to the plaintiffs' filing of a timely amended complaint outlining which branch of the tort was committed, and if necessary, the nature and existence of the contract. Finally, with respect to the claims asserted in Count IX under the Maryland Antitrust Act, all defendants' motions to dismiss will be denied.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, IT IS, this 9th day of August, 2001, ORDERED:

1. That Post and Gazette's motion to dismiss BE, and it hereby IS, DENIED, with respect to Counts I, II, IV, VI, and IX;

2. That Post and Gazette's motion to dismiss BE, and it hereby IS, GRANTED, with prejudice, with respect to claims under Count III for discrimination in the sale of newspaper advertising, but DENIED with respect to claims under Count III for discrimination in the sale of newspapers;

3. That Post and Gazette's motion to dismiss BE, and it hereby IS, GRANTED, with prejudice, with respect to Count V under the Copyright Act;

4. That Post and Gazette's motion to dismiss BE, and it hereby IS, GRANTED, without prejudice to the filing of an amended complaint, within 15 days hereof, with respect to Count VIII for intentional interference with contract;

5. That Press Network's motion to dismiss BE, and it hereby IS, DENIED, with respect to Counts I, VI, and IX;

6. That Press Network's motion to dismiss BE, and it hereby IS, GRANTED, with prejudice, with respect to the claims under Count II for attempted monopolization, but DENIED with respect to the claims under Count II for conspiracy to monopolize;

7. That Press Network's motion to dismiss BE, and it hereby IS, GRANTED, with prejudice, with respect to Counts III and IV;

8. That Press Network's motion to dismiss BE, and it hereby IS, GRANTED, without prejudice to the filing of a timely amended complaint, with respect to Count VII for breach of contract;

9. That plaintiff Sherrill Murray's claims against all defendants be dismissed;

10. That all of plaintiff Rossignol's claims against Press Network be dismissed;

11. That defendants answer the amended complaint to be filed herein within 15 days after its filing, or within 30 days of the date of this Order, whichever first occurs; and

12. That the Clerk of the Court send copies of this Memorandum Opinion and Order to the Counsel for the Parties.